JOURNAL ENTRY AND OPINION
{¶ 1} Defendant-appellant Bentley L. Axson ("Axson"; d.o.b. November 21, 1970) appeals from his jury trial convictions of (1) kidnapping; (2) rape; (3) aggravated robbery; (4) felonious assault; and, (5) attempted murder, all with firearm specifications, the imposition of consecutive sentences, and the determination that he is a sexual predator.[1] For the reasons adduced below, we affirm and remand.
 {¶ 2} The record on appeal indicates that the offenses in question occurred on February 5, 2001 in Cleveland, Ohio, during a car jacking and subsequent high speed chase.
 {¶ 3} The female victim, who was thirty-five years of age and a divorced mother of four minor children, had stopped her car at a convenient-type store on Madison Avenue at approximately 6:00 p.m. After purchasing some cigarettes, the victim drove off toward a local grocery store. She pulled her car over and stopped in the vicinity of West 74th Street to look in her purse for money. While stopped, Axson, armed with a shotgun, opened her car door and forcibly pulled her from the car. The victim heard Axson repeatedly call her a "stupid bitch" and that he was going to kill her as he pointed the shotgun at her and demanded money. The victim searched her pockets and retrieved some money, which Axson took from her. Axson next took the victim to the rear of the car, by the tree lawn, where he struck the victim's head with the wooden butt stock of the shotgun, causing the victim, bleeding heavily from the laceration caused by the blow, to fall to the ground. Some of her blood was deposited on Axson's shirt, which caused Axson to become more angry. The victim testified that a gray shirt with blood on it, admitted into evidence, was the shirt Axson was wearing at the time of the offenses.
 {¶ 4} At that point another male came up and went to search the interior of the victim's car for her purse.
 {¶ 5} The victim stood up from the ground at which time Axson demanded that she perform fellatio on him. Despite her pleas not to do it, he forced her to. He then struck the victim in the back of her head with the shotgun, causing the victim to briefly lose consciousness. When she came to, Axson kicked her several times as the other male watched, and told her to get up and repeated that he was going to kill her. These kicks caused bruising to the victim's back and sides.
 {¶ 6} Axson then asked the other male whether he would like to have intercourse with the victim. The other male declined the offer. Axson next demanded that she lay down on the ground so that he could shoot her. The other male then told Axson not to do it, to instead put the victim into the trunk of the victim's car.
 {¶ 7} The victim identified Axson in court as the perpetrator with the shotgun.
 {¶ 8} Axson and the other male then put the victim, against her will, into the car trunk. The car then left that location with Axson driving. While in the trunk, the victim made noise, begged to be let out and attempted to free herself, causing Axson to tell her to be quiet, that he would kill her.
 {¶ 9} Approximately twenty-five minutes after being abducted, the car stopped at a gasoline station where it was refueled. During this refueling the victim heard the other male inquire of Axson whether he really intended to kill the victim; the victim heard Axson answer affirmatively.
 {¶ 10} The car then left the gasoline station and stopped briefly approximately ten minutes later before again proceeding.
 {¶ 11} Some time later the victim heard sirens as the car was traveling at a high speed. Within the trunk the victim, still pleading for her life, was jostled around by the movement of the car. The car then struck something and came to a stop. The victim next heard police officers outside the car. The victim cried out to the police for help, at which time the police asked her about the location of the keys to the trunk. The victim responded that the keys were in the ignition. The police recovered the keys and freed the victim from the car trunk. The victim, shaken and bleeding from her head wound, was transported by emergency personnel to a local hospital where she received medical treatment for two head lacerations, which each required eight to ten surgical staples to close. The victim stayed overnight at the hospital.
 {¶ 12} The next day, February 6, 2001, the victim inspected her car at the police impound lot. She found her purse, which had been ransacked, inside the car, but there was no money in the purse. In all, the victim testified that, apart from her car, between $180 to $190, her Nike jacket, and some medications were taken from her during these offenses.
 {¶ 13} On February 7, 2001, the victim met with Cleveland Police Detective Maurice Hamilton at which time she identified Axson from a six photograph array and also identified Axson's voice from a tape recording as the same voice as the man who had struck her with the shotgun and repeatedly threatened to kill her.
 {¶ 14} The victim testified that she suffered from anxiety, severe headaches, and troubled sleeping as a result of these offenses. The victim also admitted to suffering chronic back pain prior to the offenses for which she took medications.
 {¶ 15} Police officers testified at the trial that their attention was first drawn to the victim's car when they observed it run a red light. The police gave chase but the driver of the victim's car would not obey police signals to pull over. Eventually, Axson was observed jumping out of the moving car. The car continued to roll along a short distance before striking a guardrail and stopping. The police chased Axson on foot, caught him a short distance later, arrested him, and put him into the back seat of a squad car. Axson's clothing was blood stained. Police then returned to the hijacked car where they heard the victim's cries for help emanating from the locked car trunk. The police found the car keys still in the ignition, set the victim free, and called for medical assistance for the victim.
 {¶ 16} Axson, after being advised of his Miranda rights, was hostile to the police, threatening them and using profanities. Axson claimed to the police that he had purchased the victim's car in a drug transaction and denied knowing that the victim was in the trunk. According to the police, Axson generally denied any part in the offenses against the victim. In booking Axson, money taken from Axson's person was tinged with blood.
 {¶ 17} Scientific testing by the police department of stains on a pair of blue jeans, a gray t-shirt, and a gray glove taken from Axson's person after his arrest, tested positive for human blood. DNA testing on these stains indicated that the victim's blood was on the t-shirt and on the gray glove.[2] The blood on the t-shirt was, according to the testifying DNA expert, Mr. Tony Tambasco, definitely not Axson's. Furthermore, DNA testing on the bloody glove, which showed a mixture of DNA including the victim's, could not exclude Axson as being a contributor to this mixture.
 {¶ 18} Subsequent to a sentencing hearing, Axson was sentenced to the following: (1) 10 years on counts one and two (which counts were merged for sentencing purposes); (2) 6 years on count three to run consecutively to counts one and two; (3) 6 years on count four to run concurrently to counts one, two and three; (4) 8 years on count five to run consecutively to counts one, two and three; (5) 1 year each on counts six and seven to run concurrently with each other and all other counts; (6) 3 years actual on the firearms specifications. Thus, the total aggregate term is 27 years. Also, the court, subsequent to hearing, classified Axson as being a sexual predator.
 {¶ 19} This appeal presents fifteen assignments of error for review.
 {¶ 20} The first assignment of error states: "Defendant Was Denied Due Process Of Law When The Court Permitted An Amendment Of The Indictment Without Re-Submission Of The Case To The Grand Jury."
 {¶ 21} Appellant argues that the amendment of count three, charging aggravated robbery, just prior to the commencement of the trial constituted an impermissible "substantial change in the indictment."
 {¶ 22} As originally indicted, count three, which also contained a firearm specification, charged Axson with violating R.C. 2911.01(A)(1): "[Axson] did, in attempting or committing a theft offense, as defined in Section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense upon [the victim], have a deadly weapon to wit: firearm, on or about his person or under his control and either displayed the weapon, brandished it, indicated that he possessed it, or used it."
 {¶ 23} The amendment to count three added, at the state's request and over the objection by the defense, language for a violation of R.C.2911.01(A)(3), as well as division (A)(1). The added language was the following: "and/or inflict or attempt to inflict serious physical harm on another person or upon [the victim]."
 {¶ 24} Crim.R. 7(D) provides in pertinent part:
 {¶ 25} "The court may at any time before, during, or after a trial amend the indictment * * * in respect to any defect, imperfection or omission in form or substance, or of any variance with the evidence, provided no change is made in the name or identity of the crime charged."
 {¶ 26} To constitute a change in the identity of the crime charged, it is necessary that the amendment require "proof of an essential factual element which the original indictment did not." Statev. Mader (Aug. 30, 2001), Cuyahoga App. No. 78200, at 5, 2001 Ohio App. LEXIS 3842 at 13, citing State v. Vitale (1994), 96 Ohio App.3d 695,701, appeal in Mader disallowed in (2002), 94 Ohio St.3d 1453.
 {¶ 27} In the present case, it is obvious that the name of the offense, aggravated robbery, was not changed by the amendment. Also, the identity of the crime charged was not changed by the amendment because the same evidence for which Axson was indicted supports the amendment.
 {¶ 28} In the alternative, even if the amendment was improper, any error therein was harmless given the overwhelming evidence against Axson and the failure of appellant to demonstrate any prejudice.
 {¶ 29} The first assignment of error is overruled.
 {¶ 30} The second assignment of error states: "Defendant Was Denied Due Process Of Law When The Court Permitted A Police Officer To Relate The Interview Of [The Victim] After Defendant's Arrest."
 {¶ 31} In this assignment appellant argues that Cleveland Police Officer Lisa Cornell's testimony concerning what the victim told the officer about the offenses while being interviewed at the emergency room, and Officer Cornell's testimony concerning the contents of a police report on this case the officer did not write, constituted inadmissible hearsay.
 {¶ 32} Officer Cornell had been dispatched to assist in the chase of the victim's car. By the time the officer arrived on the scene, the chasing police had already stopped the victim's car and were in the act of processing the scene. The trunk of the car had already been opened but the victim had not been removed from it.
 {¶ 33} Officer Cornell observed the bleeding and shaken victim at the scene but did not formally interview her. However, the officer testified that the victim kept trying to say that she knew she was going to die.
 {¶ 34} Officer Cornell followed the victim, who was being transported by EMS, to the hospital where Officer Cornell further observed the victim in the emergency room. Officer Cornell testified that the victim still had the "same demeanor as when she was found in the trunk. She was in shock, catatonic, no emotion." Officer Cornell next testified to the details of the offenses related to her at the emergency room interview by the victim. These details, which were made the subject of vigorous cross-examination of Officer Cornell by the defense, were later reiterated during the testimony of the victim.
 {¶ 35} On redirect examination, Officer Cornell, when questioned, denied writing the police report on these offenses. The state attempted to refresh Officer Cornell's memory on this belief because the report contained a statement from the preparing officer that some of the information contained within that report, details given by the victim during the emergency room interview, had been given to the preparer by Officer Cornell. The officer identified the police report exhibit placed before her and confirmed that she had given these details to the preparer. On recross-examination the defense questioned Officer Cornell on the details she had provided to the police report preparer and which then appeared in the police report.
 {¶ 36} With regard to the emergency room interview details related to the officer, we conclude that these out-of-court statements by the victim, though hearsay under Evid.R. 801(C), are admissible as an exception to the hearsay rule as "excited utterances" under Evid.R. 803(2). As recently stated by this appellate court:
 {¶ 37} "Evid.R. 803(2) provides that the following type of statement, although hearsay, is admissible:
 {¶ 38} "`A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition.'
 {¶ 39} "`* * * An appellate court should allow a wide discretion in the trial court to determine whether in fact a declarant was at the time of an offered statement still under the influence of an exciting event.' State v. Duncan (1978), 53 Ohio St.2d 215, 219, 7 Ohio Op.3d 380, 373 N.E.2d 1234. Applying the wide discretion prescribed by Duncan, this court must examine whether, pursuant to Evid.R. 803(2), the victim's statements were (1) related to a startling event or condition; (2) made while he was under the stress of excitement; and (3) whether his stress was caused by the event or condition." State v. Moulder (Oct. 3, 2002), Cuyahoga App. No. 80266, 2002-Ohio-5327, at ¶ 28-30, 2002 Ohio App. LEXIS 5342.
 {¶ 40} In the present case, the victims's statements satisfied each of the three Moulder factors.
 {¶ 41} Turning to the police report issue, we note that the police report and its details was the subject of examination during the testimony of its preparer (Officer Gibbons) immediately prior to the testimony of Officer Cornell. The jury was well aware that Officer Cornell did not prepare that report but did provide information contained therein. We see no prejudice to the appellant in permitting Officer Cornell to review that report and affirm those details she herself provided to the preparer.
 {¶ 42} The second assignment of error is overruled.
 {¶ 43} The third assignment of error states: "Defendant Was Denied Due Process Of Law And A Fair Trial When Detective Maurice Hamilton Testified As To His Opinion Of Defendant's Guilt."
 {¶ 44} In this assignment, appellant takes issue with a series of statements by the detective, Detective Hamilton, who interviewed Axson at the police station following Axson's arrest. These statements concern his misgivings regarding the truthfulness of Axson during his investigation and the correctness of the detective's belief that Axson was a perpetrator. In particular, appellant argues error in the following direct testimony by the detective. Explaining the photo array and audio tape identification:
 {¶ 45} "Now, I already knew that this face goes with that audio tape I had already made so there was, at that point there was nodoubt in my mind that this guy was involved in this crime." (Emphasis added.)
 {¶ 46} There was no objection to this testimony by the defense.
 {¶ 47} While interviewing Axson:
 {¶ 48} "Well, after the, after the photo array, had been done it became just a matter of charging Bentley at that particular point. I knew there was a second guy also involved so I continued to make attempts to talk to Bentley to see if we could find out who else was involved in this. He continued to not be truthful with me about who the accomplicewas." (Emphasis added.) Tr. 481.
 {¶ 49} There was no objection to this testimony by the defense.
 {¶ 50} Explaining his physical inspection of the scene of these offenses:
 {¶ 51} "I went over to 10519 Amor and while I was there I was photographing, after I had determined that I felt that Bentley wasdefinitely involved in this, I went over to Amor to look for the [white vehicle driven by Axson or his accomplice to the carjacking scene]." (Emphasis added.)
 {¶ 52} There was no objection to this testimony by the defense.
 {¶ 53} When confronted by the property owner at the house where the detective located the white vehicle and was taking photographs of it, the detective explained what he was doing and made an inference that Axson had lied about leaving Tanesha's house:
 {¶ 54} "I said well, I'm just taking pictures just to see if this vehicle might be involved in something. Well, the aunt became a little indignant. My vehicle, this vehicle wasn't involved in nothing and you don't have any business here and at that particular time I decided to get Tanesha's name and her Social Security, date of birth. And I asked her specifically about what time Bentley had left the house.
 {¶ 55} "Bentley had told me that he had, he hadn't left Tanesha'shouse until roughly a half an hour to just shortly before the policearrested him is what he said; * * * and that's when he had made this deal with Steve to get the car." (Emphasis added.)
 {¶ 56} There was no objection to this testimony by the defense.
 {¶ 57} Continuing with Tanesha:
 {¶ 58} "Q. Based upon the conversation you had with Tanesha, and we don't need to know exactly what the conversation was, what did you do?
 {¶ 59} "A. Well, based on that information that I received from Tanesha, I felt even stronger that Mr. Axson had been involved inthis. Everything that he had told me just was not checking out inany form." (Emphasis added.)
 {¶ 60} There was no objection to this testimony by the defense.
 {¶ 61} Finally, when questioned what else he had learned between the time of interviewing Axson and taking the case to the grand jury, the detective answered, as follows:
 {¶ 62} "As this case continued to develop and as more and more the alibis that Bentley Axson had given me were not, anything materializing out, when it was presented to the grand jury there was absolutely nodoubt that we, I wanted to indict for the attempt (sic) murder and all of the counts that he was indicted on." (Emphasis added.)
 {¶ 63} There was no objection to this testimony by the defense.
 {¶ 64} Having failed to present timely objections to the detective's opinion testimony which directly cast doubt on the credibility of appellant's alibis and innocence, appellant has waived all but plain error. The doctrine of plain error is limited to exceptionally rare cases in which the error, left unobjected to at the trial court, "rises to the level of challenging the legitimacy of the underlying judicial process itself." See Goldfuss v. Davidson, 79 Ohio St.3d 116,122, 1997 Ohio 401, 679 N.E.2d 1099. In other words, "The plain error rule should not be invoked unless, but for the error, the outcome of the trial would clearly have been otherwise. State v. Cooperrider (1983),4 Ohio St.3d 226, 227, 4 OBR 580, 581, 448 N.E.2d 452, 453. The application of the rule is to prevent manifest injustice. Id." (Emphasis added.) State v. Williford (1990), 49 Ohio St.3d 247, 252, 551 N.E.2d 1279.
 {¶ 65} Appellant argues that State v. Young (May 30, 2002), Cuyahoga App. No. 79243, 2002-Ohio-2744, 2002 Ohio App. LEXIS 2674, appeal disallowed in (2002), 96 Ohio St.3d 1517, 2002-Ohio-4950, is dispositive of this assignment. In Young, this court reversed the car theft conviction on plain error because, in part, the police detective who investigated the offense testified that he had concluded that the state's principal witness, the girlfriend of the defendant who had accused Mr. Young of stealing her car, was telling the truth when he had interviewed her concerning the theft. See Young, 2002-Ohio-2744, at ¶ 58-72. The only other non-police witness in Young was Young's niece, Nikeeta Maddox, who testified that she observed Young driving the car in question on the evening the car had been stolen. The police, alerted by Ms. Maddox, found the stolen car in Young's mother's garage. The Young majority, citing State v. Boston (1989), 46 Ohio St.3d 108,545 N.E.2d 1220, and rejecting the state's argument that the detective was merely vouching for the girlfriend's credibility and explaining police procedure for gathering and evaluating evidence, concluded that "the detective's testimony constitutes plain error because the jury was prevented from determining the truthfulness of" the testifying girlfriend-witness on its own. See Young, 2002-Ohio-2744, at ¶ 71-72. It is obvious that the Young majority, in using plain error, believed that but for the error presented by the detective's personal opinion testimony, the result of the trial would have been different.
 {¶ 66} The present case is not analogous to Young.
 {¶ 67} First, while the detective in Young was vouching for the credibility of a witness who actually testified at the trial, the detective's testimony in the present case did not vouch for the credibility of any witness who testified at the trial. Thus, unlikeYoung, the jury in the present case was not prevented from being the sole determiner of the truthfulness of any witness placed before it.
 {¶ 68} Second, the main issue in the Young case was whether the defendant had stolen his girlfriend's car, as was claimed by the testifying girlfriend, or whether, as claimed by the defendant, he did not intend to permanently deprive the girlfriend of her car or that he had permission by the girlfriend to use the car but not for the use he had put it to. The girlfriend's testimony was pivotal in determining these issues: The case was a typical "he said-she said" case except that the "he" did not testify, leaving the girlfriend's testimony of sole importance in deciding guilt. This fact supports the Young majority in concluding that the outcome of the trial would have been otherwise but for the detective's testimony concerning his opinion of the truthfulness of the girlfriend-witness's version of events. The present case, however, does not present this obstacle. As stated previously, the detective herein did not vouch for the truthfulness of any witness called at the trial. Furthermore, it cannot be demonstrated that but for the alleged error the result of the trial would have clearly been different in light of the following: (1) the fact that the defense, as a tactical decision used to gain credibility with the jury, admitted that the defendant had lied to the police during the investigation and was guilty of the aggravated robbery and kidnapping charges, but not guilty of the remaining charges; and, (2) the remaining evidence of guilt which was put before the jury.
 {¶ 69} Accordingly, the third assignment of error is overruled.
 {¶ 70} The fourth assignment of error states: "Defendant Was Denied A Fair Trial When Detective Maurice Hamilton Was Allowed To Relate The Results Of His Investigation."
 {¶ 71} In this assignment appellant argues in general manner that he was somehow prejudiced by the court permitting Detective Hamilton to testify about certain aspects of his investigation, yet appellant fails to identify any prejudice with specificity except to reference Tr. 484, 488-489, and note that no objection was raised by the defense in these three pages.
 {¶ 72} This assignment is overruled as plain error is not demonstrated.
 {¶ 73} The fifth assignment of error states: "Defendant Was Denied Due Process Of Law And A Fair Trial When The Court Failed To Exclude Alleged Obscenities Uttered By Defendant."
 {¶ 74} In this assignment, appellant argues that the court erred in ruling on a pre-trial motion in limine when it failed to rule as inadmissible certain utterances attributed to Axson following his arrest. These statements include the following: (1) when an officer at the jail, who had also helped arrest Axson, instructed Axson during booking to be quiet subsequent to Miranda rights being read, Axson purportedly stated that "maybe I'll get your wife one day, motherfucker," and that the officer's "sissy son probably takes it up the ass every day."; and, (2) when informed that the state intended to use the testimony of that officer and the offensive statements made by Axson, Axson stated that "it's no big deal, it's a white bitch and she's not going to do anything."
 {¶ 75} These statements, as conceded by appellant, were admissible as statements of a party opponent in a criminal proceeding. See Evid.R. 801(D)(2); appellant's brief at 14. Furthermore, in light of the remaining evidence of guilt, we cannot conclude that the admission of these statements was so unfairly prejudicial such that the jury's verdict could be questioned.
 {¶ 76} The fifth assignment of error is overruled.
 {¶ 77} The sixth assignment of error states: "Defendant Was Denied A Fair Trial By Reason Of The Injection Of Statements By The Prosecutor Which Evoked The Emotions Of The Jury."
 {¶ 78} The standard to be applied to alleged prosecutorial misconduct was recently iterated by this court in State v. Huff (Oct. 10, 2002), Cuyahoga App. No. 80199, 2002-Ohio-5463, at ¶ 17-18, 2002 Ohio App. LEXIS 5476:
 {¶ 79} "In State v. Turner (November 29, 2001), Cuyahoga App. No. 78520, 2001 Ohio App. LEXIS 5318, this court noted that the Ohio Supreme Court held that the test for prosecutorial misconduct is whether remarks were improper and, if so, whether they prejudicially affected substantial rights of the accused. State v. Cornwell (1999), 86 Ohio St.3d 560,715 N.E.2d 1144, State v. Smith (1984), 14 Ohio St.3d 13, 14 Ohio B. 317, 470 N.E.2d 883. The Cornwell Court found the touchstone of analysis is the fairness of the trial, not the culpability of the prosecutor.Smith v. Phillips (1982), 455 U.S. 209, 219, 102 S.Ct. 940, 947,71 L.Ed.2d 78, 87.
 {¶ 80} "The Ohio Supreme Court has also stated that the conduct of a prosecuting attorney during trial cannot be made a ground of error unless the conduct deprives the defendant of a fair trial. State v.Keenan (1993), 66 Ohio St.3d 402, 613 N.E.2d 203, citing to State v.Apanovitch (1987), 33 Ohio St.3d 19, 514 N.E.2d 394. See also State v.Iacona (2001), 93 Ohio St.3d 83, 752 N.E.2d 937. In State v. Treesh
(2001), 90 Ohio St.3d 460, 739 N.E.2d 749, the court reiterated that the prosecution is entitled to a certain degree of latitude in summation.Treesh, citing to State v. Grant (1993), 67 Ohio St.3d 465, 482,620 N.E.2d 50 and State v. Liberatore (1982), 69 Ohio St.2d 583, 589, 23 Ohio Op.3d 489, 433 N.E.2d 561. A prosecutor may draw reasonable inferences from the evidence presented at trial, and may comment on those inferences during closing argument. State v. Smith (1997),80 Ohio St.3d 89, 684 N.E.2d 668. In Treesh, supra, the court stated that the state's closing argument must be viewed in its entirety to determine whether the allegedly improper remarks were prejudicial."
 {¶ 81} Appellant considers eleven examples of alleged improper comments by the state.
 {¶ 82} First, appellant cites to the state's opening statement where, after detailing the facts and the charges at length, the prosecutor stated, "This is why I'm a prosecutor, ladies and gentlemen, because of this kind of case." There was no objection by the defense to this innocuous and isolated statement.
 {¶ 83} Second, during the presentation of evidence during the state's case, the prosecutor, after eliciting testimony from the victim on direct examination concerning the blows to her head and being forced to perform fellatio on Axson, referred to these actions as "awful acts." There was no objection by the defense to the term "awful acts."
 {¶ 84} Third, during the direct examination of the victim, the prosecutor questioned the victim, "Did there come another time when the other male stopped during this horrific event?" See Tr. 437-438. There was no objection by the defense to the term "horrific event."
 {¶ 85} Fourth, during the redirect-examination of Detective Hamilton, the prosecutor, attempting to demonstrate the purpose for the questions Detective Hamilton posed to Axson, asked of the witness, "Did you also want to put him [Axson] in the back of the car where that brutal assault happened to [the victim]?" The defense objection to the question itself was overruled by the court and the witness answered, "yes." Appellant takes issue with the use of the term "brutal assault" within this question.
 {¶ 86} Fifth, in closing argument, the prosecutor referred to the offenses as "unimaginable heinous crimes" and that these offenses "could have happened to any one of us." There was no objection by the defense to these remarks.
 {¶ 87} Sixth, in rebuttal closing argument, the prosecutor made the following statement, "The fact that two weeks ago [Axson] decided to give a statement, after 13 months of committing a crime, probably set the trial three or four times prior to this —." The defense objected to this statement, but there was no ruling by the court.
 {¶ 88} Seventh, during rebuttal closing argument, the prosecutor referred to the defense strategy as a smoke screen which was intended to cloud the factual determination as to who committed these offenses. The defense objection to this remark was overruled.
 {¶ 89} Eighth, during rebuttal closing argument, in attempting to counter the defense strategy of alleging that Axson has memory lapses due to the use of narcotics, which would explain gaps in Axson's statement to the police made shortly before trial, the prosecutor urged the jury not to believe the idea of memory lapses, arguing that Axson "had an opportunity to learn about the State's case for the last 13 months, and then gave a statement * * *." The defense objection to this statement was overruled.
 {¶ 90} Ninth, during rebuttal closing argument, the prosecution stated that one of the things that bothered the prosecutor about this case was "the callousness by this thug after he beats her * * * in the head twice with the butt of a shotgun, * * * and her blood splashes up on him, and he says, `Yeah, the bitch got her blood on me.' The callousness, the insensitivity of that man." The defense objection to this remark, "callousness by this thug," was overruled. Appellant takes issue with this small phrase.
 {¶ 91} Tenth, citing to Tr. 636, appellant references the phrase "believe the BS he put in his statement." Appellant's brief at 15. This statement does not appear at Tr. 636, or on the page prior to or after that citation. This court is under no duty to hunt and peck around the record to find this phrase: It is appellant's duty to properly cite the alleged error in the record. See App.R. 16(A)(7). Accordingly, appellant has not demonstrated the error in the record and this particular issue is without merit.
 {¶ 92} Eleventh, during rebuttal closing argument, the prosecutor, in his final remarks to the jury, implored the jury to "[H]old Bentley Axson accountable for his actions. * * * Bring justice to Bentley Axson, and I beg you to find him guilty of all those counts. Collectively work those issues, come to a conclusion, and I think when you've done that collectively together, you're going to have the same determination that I have, that he's committed these crimes. We've proven it to you. Now, it's time to bring justice to him. Thank you." There was no objection by the defense to these remarks.
 {¶ 93} As to the remarks which were not objected to by the defense, see examples 1-3, 5, 10-12, we conclude that plain error does not apply in that the result of the trial would not clearly have been different but for the alleged error. As for the remaining examples, see examples 4, 7 and 9, we conclude that the comments were reasonable inferences based on the evidence and did not deprive Axson of a fair trial. As for examples 6 and 8, the defense commented upon this same fact, that Axson told one story for almost a year and then changed his story to a truthful version, during opening statements. Defense counsel also argued this changing version of the truth pattern during closing argument. Having opened the door to this commentary during opening argument and closing statement, appellant cannot complain that the state commented on it during rebuttal closing argument.
 {¶ 94} The sixth assignment of error is overruled.
 {¶ 95} The seventh assignment of error states: "Defendant Was Denied Due Process Of Law When The Court Allowed Defendant To Be Convicted Of Complicity Without Any Proof Of Defendant Possessing A Culpable Mental State."
 {¶ 96} In this assignment appellant takes issue with the jury instruction concerning aiding and abetting. These instructions basically defined aiding and abetting and also stated that one could not commit the offense of complicity without also committing the main underlying offense. The court, in its general charges, defined the culpable mental states with those main underlying offenses, but did not repeat the culpable mental state charge as to the charges of complicity. There was no objection to these instructions. As recently stated by this court:
 {¶ 97} "We note that absent a timely objection, a defendant cannot challenge any aspect of the jury instructions on appeal. See State v.Williams (1978), 51 Ohio St.2d 112, 364 N.E.2d 1364. In addition, Crim.R. 30(A) provides, in part:
 {¶ 98} "`On appeal, a party may not assign as error the giving or the failure to give any instructions unless the party objects before the jury retires to consider its verdict, stating specifically the matter objected to and the grounds of the objection.'
 {¶ 99} "Furthermore, a deficient jury instruction does not constitute plain error unless the outcome of the trial would clearly have been different but for the error. See State v. Campbell (1994),69 Ohio St.3d 38, 630 N.E.2d 339; State v. Moreland (1990),50 Ohio St.3d 58, 62, 552 N.E.2d 894. In addition, the plain error rule should be applied with the utmost caution and invoked only under exceptional circumstances in order to prevent a manifest miscarriage of justice. See State v. Cooperrider (1983), 4 Ohio St.3d 226, 4 Ohio B. 580, 448 N.E.2d 452." State v. Jones (Nov. 7, 2002), Cuyahoga App. No. 80737, 2002-Ohio-6045, at ¶ 58-60, 2002 Ohio App. LEXIS 5873.
 {¶ 100} We do not conclude that the alleged error with these instructions on complicity constituted plain error in that, but for the error, the result of the trial would not have clearly been different.
 {¶ 101} The seventh assignment of error is overruled.
 {¶ 102} The eighth assignment of error states: "Defendant Was Denied Due Process Of Law When The Court Modified The Definition Of Proof Beyond A Reasonable Doubt."
 {¶ 103} The court gave the following instruction, in part, on "reasonable doubt": "`Proof beyond a reasonable doubt is proof of such character that an ordinary person would be willing to rely and act upon it when conducting life's most important affairs.'" There was no objection by the defense to this instruction.
 {¶ 104} Appellant takes issue with the phrase "when conducting life's most important affairs," arguing that the court should have mirrored the statutory definition of proof beyond a reasonable doubt, namely, that proof beyond a reasonable doubt "is proof of such character that an ordinary person would be willing to rely and act upon it in themost important of his own affairs." (Emphasis added.) R.C. 2901.05(D).
 {¶ 105} Appellant cites to State v. Buckley (Cuyahoga, 1990),67 Ohio App.3d 799, 805, in support of his argument. In Buckley, the court reversed and remanded the appellant's conviction, determining, in part, that the trial court's modification of the "proof beyond a reasonable doubt" definition constituted prejudicial error:
 {¶ 106} "The court's instruction used the words `in the conduct of his own affairs' instead of `in the most important of his own affairs.'This instruction amounted to prejudicial error. The legislature mandated that the statutory definition of `reasonable doubt' found in R.C.2901.05(D) be read to the jury. State v. Seneff (1980), 70 Ohio App.2d 171,179, 24 O.O.3d 215, 219, 435 N.E.2d 680, 685. We find no reason for a trial court to modify this definition in its instruction to the jury. The obvious intent of the legislature in enacting R.C. 2901.05(B) was to eliminate needless reversals of criminal convictions on account of erroneous and ad hoc definitions of reasonable doubt by trial courts. Id.
 {¶ 107} "Clearly, the jury could perceive different degrees of importance between the statutory definition and the court's modification of the statutory definition of reasonable doubt. Although an ordinary person may tolerate a given level of uncertainty or doubt in conducting his everyday affairs, when it comes to `the most important' of his affairs, an ordinary person will not tolerate the same level of uncertainty or doubt. Rather, the ordinary person will demand more precise and reliable information before committing himself to a particular course of action. Thus, the court's instruction clearly lessened the state's burden of proof and, therefore, prejudiced the defendant.
 {¶ 108} "Accordingly, the fourth assigned error is sustained."
 {¶ 109} Buckley is not dispositive. While the trial court's instruction herein did not exactly mirror the statutory definition of reasonable doubt, the instruction did not, unlike the Buckley
instruction, serve to lessen the state's burden of proof by using the verb "conducting" in relation to "life's most important affairs." If anything, the definition as given increased the state's burden. In the alternative, the failure to object to the instruction given by the court constituted harmless error in that, but for the claimed error, the result of the trial would not reasonably have been different.
 {¶ 110} The eighth assignment of error is overruled.
 {¶ 111} The ninth assignment of error states: "Defendant Was Denied Due Process Of Law When The Court Did Not Properly And Fully Define The Act Of Fellatio."
 {¶ 112} The trial court defined "fellatio" when it instructed the jury as follows: "`Fellatio' means a sexual act committed with the penis and the mouth." There was no objection by the defense to this instruction. The failure to object waived all but plain error. Based on the evidence presented we cannot conclude that, but for the claimed error, the result of the trial would have clearly been different. Therefore, plain error is inapplicable.
 {¶ 113} The ninth assignment of error is overruled.
 {¶ 114} The tenth assignment of error states: "Defendant Was Denied Due Process Of Law When The Court Did Not Dismiss The Firearm Specification And Having A Weapon Under Disability."
 {¶ 115} Appellant argues that there was insufficient evidence of there being a firearm and that, if there was a firearm, that it was operable.
 {¶ 116} "A firearm is defined as any deadly weapon capable of expelling or propelling one or more projectiles by the action of an explosive or combustible propellant. See R.C. 2923.11(B)(1). The statutory definition also says that a firearm may be unloaded or inoperable as long as it is readily rendered operable. Id. When determining whether a firearm is operable, the trier of fact can rely upon circumstantial evidence, including but not limited to, the representations and actions of the individual exercising control over the firearm. R.C. 2923.11(B)(2). Circumstantial evidence of the kind necessary to prove operability can take the form of testimony from lay witnesses who observed the firearm and the circumstances giving rise to firearm's use. See State v. Murphy (1990), 49 Ohio St.3d 206,551 N.E.2d 932, syllabus." State v. Paul (Feb. 14, 2002), Cuyahoga App. No. 79596, 2002-Ohio-591, 2002 Ohio App. LEXIS 551 at 37.
 {¶ 117} In the present case the victim had ample opportunity to observe the firearm in question as appellant brandished the weapon, struck the victim with it at least twice, and repeatedly threatened to kill her. She described the weapon as a shotgun with a wooden stock. From the totality of the circumstances, i.e., the evidence presented by the victim, who was in a position to observe the instrument and circumstances surrounding the crime, we find that the state presented evidence beyond a reasonable doubt to establish that the firearm was operable, or could readily have been rendered operable. Murphy, supra.
 {¶ 118} Appellant next argues that the trial court's instruction on the term "deadly weapon" was error. The court's instruction states: "Deadly weapon means any instrument, device or thing capable of inflicting death or designed or specifically adapted for use as a weapon, or possessed, carried or used as a weapon." (Emphasis added.) Appellant takes issue with the trial court using the phrase "death or designed," arguing that the court should have used the phrase "death and designed." Except for using "or" instead of "and" at that point in the charge, the court's instruction mirrored the statutory definition of "deadly weapon." See R.C. 2923.11(A).
 {¶ 119} There was no objection to the charge given by the court. The failure to object waived all but plain error. The evidence adequately demonstrated that the shotgun used by the appellant was capable of inflicting death and was used as a weapon. Based on the evidence presented we cannot conclude that, but for the claimed error, the result of the trial would have clearly been different. Therefore, plain error is inapplicable.
 {¶ 120} The tenth assignment of error is overruled.
 {¶ 121} The eleventh assignment of error states: "Defendant Was Denied Due Process Of Law When The Court Overruled Defendant's Motion For Judgment Of Acquittal."
 {¶ 122} This assignment argues that there was insufficient evidence to support the convictions.
 {¶ 123} In analyzing an argument alleging insufficiency of the evidence we are guided by the following:
 {¶ 124} "In a test for sufficiency, `the relevant question is whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' (Emphasis sic.) Jacksonv. Virginia (1979), 443 U.S. 307, 319, 99 S.Ct. 2781, 2789,61 L.Ed.2d 560, 573; State v. Jenks (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus. Therefore, we will examine the evidence to determine whether the average mind would be convinced of defendant's guilt beyond a reasonable doubt. Jenks at paragraph two of the syllabus."State v. Stallings, 89 Ohio St.3d 280, 289, 2000-Ohio-164, 731 N.E.2d 159,171.
 {¶ 125} Based on the evidence presented, and viewing same in a light most favorable to the state, we conclude that there was more than sufficient evidence presented supporting the offenses of rape, attempted murder, and felonious assault, and the court did not err in denying the motions for acquittal.
 {¶ 126} The eleventh assignment of error is overruled.
 {¶ 127} The twelfth assignment of error states: "Defendant Was Denied Effective Assistance Of Counsel."
 {¶ 128} Appellant argues that defense counsel's performance at trial was ineffective in failing to make timely objections to a host of alleged errors previously raised in other assignments herein, failing to file a motion to suppress evidence prior to trial attacking the victim's identification of appellant during the police investigation, and by defense counsel admitting to the jury that appellant was guilty of kidnapping and aggravated robbery charges in association with the victim herein. This admission of certain offenses was used as a defense trial tactic in an attempt to bolster appellant's credibility before the jury to aid the defense theory that appellant did not commit the remaining charges.
 {¶ 129} This court recently stated the standard of review to be applied in assignments alleging ineffective assistance of trial counsel:
 {¶ 130} "Ineffective assistance claims are evaluated in a two-step process. First, the defendant must show that counsel's representation fell below an objective standard of reasonableness. State v. Keenan (1998),81 Ohio St.3d 133, 152, 689 N.E.2d 929, citing to Strickland v.Washington (1984), 466 U.S. 668, 688, 80 L.Ed.2d 674, 104 S.Ct. 2052. Second, the defendant must show that there is a reasonable probabilitythat, but for counsel's unprofessional errors, the result of theproceeding would have been different. Id. See, also, State v. Davie
(1997), 80 Ohio St.3d 311, 331, 686 N.E.2d 245 and State v. Reynolds
(1997), 80 Ohio St.3d 670, 674, 687 N.E.2d 1358. There is a strong presumption that licensed attorneys are competent and that the challenged action is the product of sound trial strategy. State v. Hamblin (1988),37 Ohio St.3d 153, 524 N.E.2d 476. Even debatable tactics do not constitute ineffective assistance of trial counsel, for it is obvious that nothing is seen more clearly than with hindsight. State v. Clayton
(1980), 62 Ohio St.2d 45, 49, 16 Ohio Op.3d 35, 402 N.E.2d 1189. A reviewing court must evaluate trial counsel's performance on the facts of the particular case as of the time of counsel's conduct. Strickland, supra." (Emphasis added.) State v. Poole, Cuyahoga App. No. 80150,2002-Ohio-5065, at ¶ 13, 2002 Ohio App. LEXIS 5111 at 7-8.
 {¶ 131} We conclude that appellant cannot, at the least, demonstrate the second prong of the test for ineffective assistance of counsel since the result of the trial, but for the suggested errors, would not have clearly been different. Absent this showing of prejudice, we overrule the twelfth assignment of error.
 {¶ 132} The thirteenth assignment of error states: "Defendant Was Denied Due Process Of Law When The Court Did Not Merge The Offense Of Felonious Assault And Attempted Murder."
 {¶ 133} Appellant's argument regarding merger is premised on appellant's belief that the two offenses in issue, felonious assault and attempted murder, are allied offenses of similar import pursuant to R.C.2941.25 and should have been merged for sentencing purposes.
 {¶ 134} In State v. Mughni (1987), 33 Ohio St.3d 65, 67,514 N.E.2d 870, the Supreme Court of Ohio reviewed the proper analysis under R.C. 2941.25 and stated:
 {¶ 135} "In determining whether two offenses are allied under R.C. 2941.25, this court has employed a two-step analysis. The first step requires a comparison of the elements with which the defendant is charged, for the purpose of discovering whether the elements of both offenses correspond to such a degree that the commission of one offense will result in the commission of the other. If so, they are allied offenses of similar import. If the court so finds, it must proceed to the second step, which involves a review of the defendant's conduct to determine whether the offenses were committed separately or with a separate animus as to each. If so, the defendant may be convicted of both." See, also, State v. Blankenship (1988), 38 Ohio St.3d 116; Statev. Box (Cuyahoga, 1993), 89 Ohio App.3d 614, 621-622.
 {¶ 136} Under the above test, even if two offenses are of similar import under R.C. 2941.25(A), a defendant can still be sentenced separately for those offenses pursuant to R.C. 2941.25(B) if each was committed separately or with separate animuses. State v. Harris (Dec. 15, 1988), Cuyahoga App. No. 54555, unreported.
 {¶ 137} Proceeding to the first step in the allied offense test, we note that the offense of felonious assault must be established with proof that a defendant (1) knowingly (2) caused serious physical harm to another. Box, supra, at 622. The offense of attempted murder under R.C.2903.02(B) requires proof that a defendant attempted to (1) cause the death of another (2) as a proximate result of the offender committing, or attempting to commit, an offense of violence which is a first or second degree felony, not including voluntary/involuntary manslaughter. Comparing the two offenses, it is readily apparent that the elements do not correspond to such a degree that the commission of one offense would result in the commission of the other offense.
 {¶ 138} Even if the elements of the offenses did correspond, appellant could be convicted of both offenses under the second part of the allied offense test since each were the result of separate acts. For example, the felonious assault offense was complete when appellant struck the victim in her head with the shotgun, causing severe lacerations to her head. The attempted murder offense was complete when the appellant kidnapped[3] the victim by putting her into the trunk of the car and threatened to kill her with the shotgun. Thus, merger of these two offenses was not proper.
 {¶ 139} The thirteenth assignment of error is overruled.
 {¶ 140} The fourteenth assignment of error states: "Defendant Was Denied Due Process Of Law And Subjected To A Cruel And Unusual Punishment When Defendant Was Sentenced To Consecutive Sentences."
 {¶ 141} In this assignment appellant argues that consecutive sentences were improper based on the failure of the trial court to provide the necessary findings under R.C. 2929.19(B)(2)(c).
 {¶ 142} With regard to the imposition of consecutive sentences, this court recently iterated the following:
 {¶ 143} "* * * R.C. 2929.14(E)(4) authorizes a court to impose consecutive sentences only when it concludes that the sentence is (1) necessary to protect the public from future crime or to punish the offender; (2) not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public; and (3) the court finds one of the following: (a) the crimes were committed while awaiting trial or sentencing, under sanction or under post-release control; (b) the harm caused by multiple offenses was so great or unusual that a single prison term would not adequately reflect the seriousness of his offense; or (c) the offender's criminal history demonstrates that consecutive sentences are necessary to protect the public from future crime. R.C. 2929.14(E)(4).
 {¶ 144} "Imposing consecutive prison terms for convictions of multiple offenses, therefore, is appropriate upon making certain findings as enumerated in this statute. When the trial court does so, however, it must state its reasons on the record. See R.C. 2929.19(B)(2)(c). Failure to sufficiently state these reasons on the record constitutes reversible error. See State v. Albert (1997), 124 Ohio App.3d 225, 705 N.E.2d 1274; see, also, State v. Gary (2001), 141 Ohio App.3d 194, 750 N.E.2d 640."State v. Johnson (Dec. 19, 2002), Cuyahoga App. No. 80436,2002-Ohio-7057, at ¶ 114-115, 2002 Ohio App. LEXIS 6864.
 {¶ 145} In the present case, the trial court made specific findings on the record in support of its reasons for the sentence. These reasons include the following: (1) that the offenses involved an ongoing course of criminal conduct rather than "a crime that was committed in the heat of a mood;" (2) the crime included cruelty to the victim and a terrorizing of the victim; (3) that the crime was motivated by the victim's sex, that she was a defenseless female (R.C. 2929.12[B][8]); (4) that the victim suffered severely, including physical and psychological harm (R.C. 2929.12[B][2]); (5) that the violent rape offense constituted the "worst form of the offense;" (6) that there was a "great likelihood of your committing future crime based upon the facts of this offense and your criminal record" (R.C. 2929.14[E][4][c]); (7) that consecutive terms of imprisonment are required "in order to protect the public from future criminal conduct on your part as well as finding that consecutive terms are called for here in order to punish you, finding that due to the harm that you occasioned to [the victim] a single term will not adequately reflect the seriousness of your offenses" (R.C. 2929.14[E][4][b] and [c]; (8) that the court considered in mitigation appellant's mental health status; (9) that, to appellant's credit in mitigation, appellant identified his accomplice to the police in a statement, but the balance of that statement, which conflicted with the evidence of guilt brought out at trial, should factor against mitigation of sentence, R.C.2929.12[D]); and, (10) that the sentence is tempered with the knowledge that the penalty for aggravated murder under these circumstances, had appellant completed his threat of killing the victim, would be 30 years plus 3 years for the firearm specification.
 {¶ 146} Contrary to the assertions of appellant, the trial court made the appropriate findings, with adequate reasons, supporting the imposition of consecutive sentences.
 {¶ 147} The fourteenth assignment of error is overruled.
 {¶ 148} The fifteenth, and final, assignment of error states: "Defendant Was Denied Due Process Of Law When He Was Declared To Be A Sexual Predator."
 {¶ 149} This court recently iterated the standard to be applied when determining whether a sexual predator classification is supported by sufficient evidence:
 {¶ 150} "The standard of proof for determining sexual predator status is clear and convincing. `The sexual predator determination requires * * * evidence the offender is likely to engage in the future in one or more sexually oriented offenses. Not only must it be probable (more likely than not) that such a future offense will occur, but such likelihood must be proven by the heightened standard of clear and convincing evidence.' State v. Arthur (2001), Cuyahoga App. No, 77770, 2001 Ohio App. LEXIS 3596, at *9. In order to satisfy this standard, `there must be something of substance from which one could draw a logical conclusion concerning the likelihood of recidivism to reach a firm belief or conviction that defendant is likely to commit a sexually oriented offense in the future.' 2001 Ohio App. LEXIS 3596 at *10.
 {¶ 151} "Defendant claims that the factors listed in R.C. 2950.09, which the court is to consider in making its determination, do not support the court's decision. Instead of supporting the designation of him as a sexual predator, he argues, the factors actually show that he is not likely to commit a sexually oriented offense in the future. The factors listed in R.C. 2950.09 include,
 {¶ 152} "`(a) The offender's * * * age;
 {¶ 153} "`(b) The offender's * * * prior criminal or delinquency record regarding all offenses, including, but not limited to, all sexual offenses;
 {¶ 154} "`(c) The age of the victim of the sexually oriented offense for which sentence is to be imposed or the order of disposition is to be made;
 {¶ 155} "`(d) Whether the sexually oriented offense for which sentence is to be imposed * * * involved multiple victims;
 {¶ 156} "`(e) Whether the offender * * * used drugs or alcohol to impair the victim of the sexually oriented offense or to prevent the victim from resisting;
 {¶ 157} "`(f) If the offender * * * previously has been convicted of or pleaded guilty to * * * a criminal offense, whether the offender * * * completed any sentence * * * imposed for the prior offense or act and, if the prior offense or act was a sex offense or a sexually oriented offense, whether the offender * * * participated in available programs for sexual offenders;
 {¶ 158} "`(g) Any mental illness or mental disability of the offender * * *;
 {¶ 159} "`(h) The nature of the offender's * * * sexual conduct, sexual contact, or interaction in a sexual context with the victim of the sexually oriented offense and whether the sexual conduct, sexual contact, or interaction in a sexual context was part of a demonstrated pattern of abuse;
 {¶ 160} "`(i) Whether the offender * * *, during the commission of the sexually oriented offense for which sentence is to be imposed or the order of disposition is to be made, displayed cruelty or made one or more threats of cruelty;
 {¶ 161} "`(j) Any additional behavioral characteristics that contribute to the offender's * * * conduct.'
 {¶ 162} "Although the court is required to consider all these factors, it is not required to list them at the hearing. Rather, it should address the factors it considers pertinent, as well as any other significant factors not contained in the list. State v.Cook (1998), 83 Ohio St.3d 404, 426, 700 N.E.2d 570.
 {¶ 163} "The trial court may consider a number of sources in making its determination, including `trial transcripts, victim statements, and * * * pre-sentence reports that either relate to the factors listed in R.C. 2950.09(B) or are probative of the second prong of the statutory definition * * *.' State v. Ferrell (1999), Cuyahoga App. No. 72732, 1999 Ohio App. LEXIS 1048, * 11. Additionally, `the use of expert testimony, whether such testimony is psychiatric, psychologic, or criminologic, may be useful in supplementing the bare facts of a conviction.' Id." State v. Chancellor (Jan. 16, 2003), Cuyahoga App. No. 80321, 2003-Ohio-147, at ¶ 5-18.
 {¶ 164} In the present case the trial court conducted the sexual predator classification hearing immediately prior to sentencing appellant on the main offenses.
 {¶ 165} With a presentence investigation report having been prepared in anticipation of sentencing, the court heard arguments from the parties on the classification issue. During this hearing the state offered evidence of an uncharged 1991 rape involving the appellant and an eighteen year old victim; this alleged offense was supported by the police report which was made on the incident and the statement of the alleged victim, both of which were offered into evidence through State Exhibits 1 and 2 (which exhibits are not in the record on appeal). The state also offered evidence of appellant's criminal history involving multiple felony convictions in several cases since 1997.
 {¶ 166} The court specifically found the following: (1) that the offender has been convicted of a sexually oriented offense, to-wit, rape; (2) that the offender's age at the time of the present rape was 31 years of age (R.C. 2950.09[B][3][a]); (3) that the victim's age at the time of the present rape was 35 years of age (R.C. 2950.09[B][3][c]); (4) that the offender has three prior felonies, "including two that the Court would consider to be offenses involving violence, and that women have been victimized on a number of occasions in connection with his criminal past" (R.C. 2950.09[B][3][b]); (5) that the present offenses involved violence; (6) that the offender showed cruelty to the victim in this case (R.C. 2950.09[B][3][i]); and, (7) that the victim in this case suffered very severe physical and psychological harm as a result of these offenses.
 {¶ 167} Based on these findings we cannot say that the trial court abused its discretion in concluding that appellant, by clear and convincing evidence, posed a risk of sexually reoffending in the future.
 {¶ 168} The fifteenth assignment of error is overruled.
 {¶ 169} Our review of the record reveals that, notwithstanding the journal entry stating that "post release control is part of this prison sentence for the maximum amount allowed for the above felony(s) under R.C. 2967.28," no such information was given to Axson at the sentencing hearing.[4]
 {¶ 170} Under R.C. 2967.28, a person convicted for a felony sex offense is subject to a mandatory five years of post-release control. R.C. 2929.19(B)(3) requires that the judge advise the defendant that he will be subject to supervision by the parole authority following release from prison and the penalties that can be imposed should he violate the terms and conditions of supervision or post-release control. In Woodsv. Telb, 89 Ohio St.3d 504, 2000-Ohio-171, 733 N.E.2d 1103, the Supreme Court of Ohio held that a defendant must be informed at sentencing that post-release control is part of his sentence to avoid a constitutional challenge. See, also, State v. Fitch (Sept. 19, 2002), Cuyahoga App. No. 79937.
 {¶ 171} Because the record proves Axson was not advised of mandatory post-release control, it is not part of his sentence. The lower court is ordered to correct the appellant's sentencing journal entry to reflect that post-release control is not part of his sentence.
Judgment affirmed, case remanded.
[1] In addition to these offenses, the trial court found Axson guilty of two counts, counts six and seven, of having a weapon while under a disability. The trial court, subsequent to hearing, also classified Axson to be a sexual predator. The defense offered no witnesses on its behalf during the trial.
[2] DNA expert Dr. Julie Heinig testified that the odds of an unrelated random African-American individual having the same DNA profile found on the t-shirt would be one in one quintillion, and for a random unrelated Caucasian the odds would be one in one quadrillion. Either of these numbers greatly exceeds the population of the earth.
[3] Kidnapping, see R.C. 2905.01, is a first or second degree felony and, by virtue of R.C. 2901.01(A)(9)(a), is defined as an "offense of violence."
[4] State v. Sell (May 15, 2002), Cuyahoga App. No. 73850.